# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **BRIAN HOELZLE**, <br><br> Plaintiff, <br><br> *v.* <br><br> **VENSURE EMPLOYER SERVICES, INC., et al.**, <br><br> Defendants. | **CIVIL ACTION** <br><br><br> **NO. 2:20-cv-00473-KSM** |

## <u>MEMORANDUM</u>

**MARTSON, J.**                                                **February 18, 2022**

Plaintiff Brian Hoelzle claims that he was employed by and wrongfully terminated from Defendant EmployeeMax Acquisition, LLC ("EmployeeMax"). (Doc. No. 1.) He brings the following claims against EmployeeMax and its parent, Vensure Employer Services, Inc. ("Vensure") (together with EmployeeMax, "Defendants") in connection with his termination: breach of contract (Count I), unjust enrichment (Count II), violation of Pennsylvania's Wage Payment and Collection Law ("WPCL") (Count III), wrongful termination (Count IV), breach of contract (Count V), and promissory estoppel (Count VI). (*Id.*) Defendants dispute their liability and bring the following counterclaims against Hoelzle: tortious interference with contractual relations (Counterclaim Count I), tortious interference with prospective contractual relations (Counterclaim Count II), commercial disparagement (Counterclaim Count III), and defamation (Counterclaim Count IV). (Doc. No. 3 at 15–24.)

Presently before the Court is Defendants' Motion for Partial Summary Judgment on Counts I–VI (Doc. No. 29) and Hoelzle's Cross-Motion for Partial Summary Judgment on

Counts I, II, III, and V and Counterclaim Counts I–IV (Doc. No. 34).  For the reasons below, Defendants' motion is granted in part and denied in part, and Hoelzle's cross-motion is granted in part and denied in part.

## I.   BACKGROUND

### A.   *Factual Background*

#### 1.   Hoelzle's Tenure at ESO

On June 20, 2015, Hoelzle was hired as the Vice President of Business Development for Employer Service Online, LLC ("ESO"), a company that sold payroll processing systems to corporate clients.  (Doc. No. 34-9 at 7, 213.)  Innovant Investment Group, LLC (which was also known as "EmployeeMax Investment Holdings" ("EMIH")) held a 75% membership interest in ESO (Doc. No. 34-7 at 23), and Hoelzle held a 1.87% ownership interest in EMIH (*id.* at 206).[1]

According to ESO's offer letter (which served as his employment contract), Hoelzle received a base salary of $90,000 and commission payments based on the following structure:

- For the first 3,000 employees enrolled in ESO's payroll processing system, 10% of qualified billings for channel/partner businesses and 15% of qualified billings for non-channel/partner businesses.

- For any additional employees enrolled in ESO's payroll processing system beyond the first 3,000 employees, 15% of qualified billings for channel/partner businesses and 20% of qualified billings for non-channel/partner businesses.

(*Id.*)  Hoelzle would receive commissions for 24 months following the customer's first payment

---

[1] "CAMA SDIRA LLC fbo Brian Hoelzle Roth IRA" also held a 1.44% ownership interest in EMIH.  (Doc. No. 34-7 at 206.)

to ESO.  (*Id.*)  In addition to his base salary and commission payments, Hoelzle also received

fringe benefits, including four weeks, or 20 days, of vacation per year with the opportunity to

accrue 10 additional vacation days per year.[2]  (*See id.*; Doc. No. 34-9 at 37; *see also* Doc. No.

34-2 ¶ 34; Doc. No. 35 at 3.)

In July 2017, in addition to his role as Vice President of Business Development, Hoelzle

began to serve as a director of ESO.  (Doc. No. 34-3 ¶ 37.)  Almost as soon as he joined ESO's

board, Hoelzle was named as a defendant in *Curran v. Innovant Investment Group, LLC*, No.

2017-101283 (Phila. Ct. Common Pleas) (the "Curran Lawsuit"), a lawsuit Robert Curran, the

former President and Chief Executive Officer of ESO, brought against the company and its

directors.  (*Id.*)  Hoelzle also soon learned that Curran and Christopher Hogg, another of the

company's directors, had been embezzling funds from the company's tax escrow account.[3]

(Doc. No. 34-2 ¶ 38.)  At that time, Hoelzle "took control" of the tax escrow account but did not

report this activity to the authorities.  (*Id.*)

## 2.    Vensure's Purchase of ESO's Assets

In the spring of 2018, Hogg met with Alex Campos, the Chief Executive Officer of

Vensure, a rapidly expanding payroll processing company, to discuss Vensure's possible

acquisition of ESO.[4]  (*Id.* ¶ 40.)  Vensure, acting through EmployeeMax (a subsidiary of Vensure

---

[2] Hoelzle also accrued "3.33 of personal/sick leave each month, up to a total of 40 per 12-month period."  (Doc. No. 34-9 at 38.)  Hoelzle states (and Defendants do not dispute) that this means he was accruing 3.33 *days* of personal/sick leave each month.  (Doc. No. 34-2 ¶ 34; Doc. No. 35 at 3.)

[3] As a payroll processing company, ESO withheld federal and state taxes from its clients' employees' paychecks, held those funds in its tax escrow account, and eventually paid those funds to taxing authorities.

[4] Since August 2017, Vensure has acquired the stock or assets of 24 payroll processing companies.  (Doc. No. 29-1 ¶ 2.)

specially created to acquire ESO) planned to acquire all of ESO's outstanding stock for $2,250,000.  (Doc. No. 29-1 ¶ 4.)

In April 2018, Hogg informed Hoelzle of the possible transaction and scheduled a conference call between Campos, Hogg, Hoelzle, and Christopher Glover, another director of ESO.  (*Id.*)  Campos explained that he understood the "banking and trust account issues" ESO was facing and promised that, if they agreed to the deal, Vensure would "resolve" those issues. (*Id.*)  Through due diligence conducted in connection with the potential transaction, Vensure learned that ESO was a distressed company and owed taxes in the amount of $3,000,000.  (Doc. No. 29-1 ¶ 5.)  Vensure also learned that ESO was on the verge of losing its automated clearing house capabilities, which would have made it "impossible" for the company to continue functioning as a payroll processor.  (*Id.* ¶ 7.)

On May 2, 2018, a few days after their initial call, Hogg, Hoelzle, and Glover traveled to Arizona to execute the transaction.  (Doc. No. 34-2 ¶¶ 40–41.)  At this point, Hoelzle and Glover thought the deal was going to be a stock acquisition (*id.* ¶ 41), but Campos and Hogg had agreed to convert the deal to an asset purchase so Vensure would "avoid any liabilities of ESO" (Doc. No. 29-1 ¶ 6).  Hoelzle and Glover reviewed the Asset Purchase Agreement but refused to sign it because they felt that it "contained inaccurate representations and warranties."  (Doc. No. 34-2 ¶ 12; Doc. No. 34-3 at 108.)  Desperate to get the deal done, Hogg asked Hoelzle and Glover to "resign as directors of ESO" but promised that "after they resign and he signs the board resolution approving these transactions, they [would] be reinstated to the board."  (Doc. No. 34-9 at 48.)  They both agreed and resigned from the ESO board (*id.* at 47), and Hogg executed the Asset Purchase Agreement on ESO's behalf (Doc. No. 34-3 at 108).

The Asset Purchase Agreement transferred ESO's assets, including its equipment and

4

tangible property, all rights to payments, and goodwill, to EmployeeMax. (Doc. No. 34-3 at 70–72.) Under this provision, EmployeeMax assumed all of ESO's client contracts, but it did not assume any employee contracts. (*Id.* at 70; Doc. No. 34-4 at 7–9.) The Asset Purchase Agreement also gave EmployeeMax the right to terminate any ESO employees at the time of closing (Doc. No. 34-3 at 91), but EmployeeMax chose not to do so (Doc. No. 34-4 at 43).

### 3.      Hoelzle's Post-Transaction Employment

On the transaction's closing, Hoelzle worked as President of EmployeeMax. (Doc. No. 29-1 ¶ 16.) He was responsible for creating sales and bringing in new clients and continued to receive the salary he had been paid at ESO. (*Id.*) Hoelzle reports that he was "initially excited" to work for EmployeeMax and was looking forward to bringing in new customers. (Doc. No. 34-2 ¶ 52.)

All the while, the *Curran* Lawsuit was still pending, and Hoelzle's legal fees were mounting. (Doc. No. 29-1 ¶ 21.) Hoelzle asked Campos if Vensure and/or EmployeeMax would indemnify him in connection with the *Curran* Lawsuit. (*Id.*) Hoelzle claims Campos orally assured him that Vensure and EmployeeMax "would make things right" as to indemnification, but never did. (Doc. No. 34-2 ¶ 51.) Defendants dispute this contention; they report that Campos offered Hoelzle a personal loan, which Hoelzle chose not to accept,[5] but that neither Vensure nor EmployeeMax ever agreed to indemnify Hoelzle in connection with the lawsuit.[6] (Doc. No. 29-1 ¶ 23.)

---

[5] Glover accepted a $25,000 personal loan from Campos.

[6] Because the Court is faced with cross-motions for summary judgment, we have indicated the areas of factual dispute and will consider the facts in the light most favorable to the nonmoving party with respect to each motion in the analysis.

After a few months, Hoelzle's initial excitement for EmployeeMax waned.  (*Id.* ¶ 52.)
He reports that was told not to onboard any new customers until EmployeeMax and Vensure
updated their payroll processing software.  (*Id.*)  He grew frustrated and felt that Vensure's
customer service department took the position that "the customer [was] always wrong" and that
Vensure was unable to "handle" the kind of larger clients that he was used to bringing in.  (*Id.*)
Hoelzle also felt that he had "absolutely no authority with respect to the business" and instead,
felt that Vensure employees "controlled every aspect of the business of EmployeeMax, including
the bank accounts and finances, human resources (hiring/firing), IT, and all day[-]to[-]day
aspects of the business."  (*Id.* ¶ 53.)  Defendants concede that it did not allow any former ESO
officers to "sign checks or documents or otherwise exercise control of any funds" given Curran
and Hogg's misappropriation of the tax escrow funds.  (Doc. No. 35 ¶ 53.)

### 4.    Hoelzle's Termination

In February 2019, Hoelzle informed Hogg that he intended to report Hogg's criminal
activities (including his misappropriation of withholding taxes from ESO's escrow accounts)[7] to
the FBI.  (Doc. No. 34-2 ¶ 55.)  Hoelzle states that "[t]here can be little doubt that Hogg
informed" one of his associates, Vik Jain (the individual who had initially connected Hogg with
Vensure) that Hoelzle was planning to report Hogg to the FBI.  (*Id.*)  Hoelzle was terminated
five days later.  (*Id.*)  Defendants, on the other hand, say that they only learned that Hoelzle
reported Hogg to the FBI in the course of this litigation (Doc. No. 29-1 ¶ 26) and that Hoelzle
was terminated "for poor performance, a general poor attitude and poor treatment of clients and

---

[7] In addition to Hogg's embezzlement of the money held in ESO's tax escrow accounts, Hoelzle
also planned to report Hogg for placing a $1,500,000 "fraudulent insurance loan on ESO." (Doc. No. 34-2
¶ 55.)

fellow employees" (Doc. No. 29-1 ¶ 25).

On Hoelzle's termination, EmployeeMax paid his "unpaid compensation, paid time off, and other benefits that had accrued during his employment" with EmployeeMax.  (Doc. No. 29-1 ¶ 29.)  But they did not pay him any commissions he earned or time off he accrued during his previous employment with ESO.  (*Id.*)

### 5.  Hoelzle's Post-Termination Correspondence with EmployeeMax Customers

In May 2018, shortly *after* Hoelzle was terminated, he emailed two EmployeeMax clients informing them that Vensure was switching to a new software system and would be "unable to migrate their data, provide them with the customer reports they had been receiving, [or] . . . correctly pay local taxes."[8]  (Doc. No. 34-2 ¶¶ 60–61.)  These customers "expressed concerns" that the new system would be unable to migrate their data and that they would no longer receive customer reports.  (*Id.* ¶ 63; Doc. No. 35 ¶ 63.)  Despite their concerns, both customers remained with EmployeeMax for at least another year, and Defendants are not aware of any other customers who "decided not to engage" with EmployeeMax or Vensure because of Hoelzle's statements.  (Doc. No. 34-7 at 174; Doc. No. 35 ¶ 66.)

### B.  *Procedural History*

On December 3, 2019, Hoelzle commenced this action in the Chester County Court of Common Pleas.  (Doc. No. 1 at 32–46.)  Defendants timely removed this action to this Court (*id.*

---

[8] The parties dispute the truth of these statements, but Hoelzle asserts, and EmployeeMax admits, that Vensure employees had made clear "that there was no intention to migrate old data to the [new software] system and that they did not intend to continue to provide the reports that customers like [the two with whom Hoelzle had corresponded] had enjoyed during their time with ESO and then at EmployeeMax prior to the transition to the Prism system."  (Doc. No. 34-2 ¶ 62; Doc. No. 35 ¶ 62.)  The parties dispute whether Defendants were "able to correctly pay local taxes" using the new software. (Doc. No. 34-2 ¶ 61; Doc. No. 35 ¶ 61.)

at 1–10) and brought crossclaims against Hoelzle (Doc. No. 3 at 15–24).

At the end of fact discovery, Defendants moved for summary judgment on Counts I–VI. (Doc. No. 29.)  Hoelzle opposes the motion (Doc. No. 34) and cross-moved for summary judgment as to Counts I, II, III, and V and all of Counterclaim Counts I–IV.  (*Id.*)  Defendants oppose the cross-motion.  (Doc. No. 35.)  The Court held oral argument on February 16, 2022. (Doc. No. 38.)

## II.   ANALYSIS

### A.   *Legal Standard*

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law."  *Id.* at 248.  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  "[T]he inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks and alterations omitted).

"The same standards and burdens apply on cross-motions for summary judgment."

*United States v. Weiss*, 461 F. Supp. 3d 183, 187 (E.D. Pa. 2020) (quoting *Allah v. Ricci*, 532 F. App'x 48 (3d Cir. 2013)).  "If review of the cross-motions reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts."  *Id.* (cleaned up).

> **B.   Discussion**

The Court first addresses Hoelzle's argument that Vensure is EmployeeMax's alter ego; we then consider whether summary judgment is appropriate as to each of Hoelzle's claims and Defendants' counterclaims.

> **Alter Ego**

Hoelzle named both EmployeeMax and Vensure as defendants to this lawsuit.  (Doc. No. 1 at 32.)  However, because he was never employed by (or otherwise party to a contract with) Vensure, Hoelzle argues that Vensure is liable under an alter ego theory.  (*Id.* at 39.)  Defendants argue that they are entitled to summary judgment on the claims as against Vensure because Hoelzle "has zero evidence to support his alter ego theory."  (Doc. No. 29-2 at 12.)

Under Pennsylvania law, courts "presume the legitimacy of the corporate form" and will only apply alter ego liability where "exceptional circumstances warrant such an exceptional remedy."[9]  *Accurso v. Infra-Red Servs., Inc.*, 23 F. Supp. 3d 494, 509 (E.D. Pa. 2014).  In considering whether to apply alter ego liability, courts consider the following factors: "undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs[,] and use of the corporate form to perpetrate a fraud."  *Lumax*

---

[9] The parties agree that Hoelzle's claims arise under Pennsylvania law.  (*See* Doc. No. 29-2 at 12; Doc. No. 34-1 at 19.)

*Indus., Inc. v. Aultman*, 669 A.2d 893, 895 (Pa. Super. Ct. 1995).  The party seeking to disregard

the corporate form bears the "extremely high" burden of establishing alter ego liability.  *Sheet*

*Metal Workers' Int'l Ass'n Local Union No. 19 v. Main Line Mech., Inc.*, Civil Action No. 11–

1025, 2013 WL 867123, at *4 (E.D. Pa. Mar. 7, 2013).

Hoelzle has not put forth sufficient evidence to support his claim that Vensure is the alter

ego of EmployeeMax.  He claims that he "was unaware of who was on the Board of Directors of

EmployeeMax," that he "had no access to or control over bank accounts or personnel" of

EmployeeMax, and that he felt he had "essentially no decision-making authority" at

EmployeeMax.  (Doc. No. 34-1 at 20.)  But the fact that Hoelzle was not aware of the corporate

formalities separating Vensure and EmployeeMax does not evidence that they were not in place.

Nor does the fact that Hoelzle did not have control over bank accounts or personnel evidence that

Vensure employees did.[10]  Moreover, Hoelzle does not even argue that any of the other factors

are present—he does not contend that EmployeeMax was undercapitalized, that EmployeeMax

and Vensure failed to adhere to corporate formalities, that there was overlap between Vensure's

and EmployeeMax's directors and officers,[11] or that Vensure used EmployeeMax to perpetrate a

---

[10] Defendants concede that Hoelzle did not have authority "to sign checks or documents or otherwise exercise control of any funds" but they explain that *no* former ESO employees had such authority.  (Doc. No. 35 ¶ 53.)  This concession alone is insufficient to establish that Vensure had control over EmployeeMax's financials.

[11] Even if Hoelzle had identified such overlap, where a parent company owns all of a subsidiary's stock, "it is to be expected that there will be directors which are common to both boards," and it is "quite possible that those who occupy such positions might exercise some degree of control over the subsidiary."  *See In re Sch. Asbestos Litig.*, No. 83–0268, 1993 WL 209719, at *6 (E.D. Pa. June 15, 1993) (cleaned up); *see also In re Enterprise Rent-A-Car Wage & Hour Emp't Pracs. Litig.*, 735 F. Supp. 2d 277, 322–23 (W.D. Pa. 2010) ("The sharing by the corporations of directors and the ownership by defendant parent of one-hundred percent of ERAC–Pittsburgh's stock do not implicate that defendant parent controlled the subsidiary to the extent necessary to find that ERAC–Pittsburgh is an alter ego of defendant parent.").

10

fraud.  (*See generally* Doc. No. 34-1 at 19–20.)

Although Hoelzle broadly asserts that "EmployeeMax did not operate as an entity separate and distinct from Vensure," "[b]road assertions without any specific evidence whatsoever are insufficient to support a claim at summary judgment." *Liberman v. Corporacion Experienca Unica, S.A.*, 226 F. Supp. 3d 451, 470 (E.D. Pa. 2016) (citing *Anderson*, 477 U.S. at 249); *see also In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.*, No. MDL NO. 2445, 2017 WL 4810801, at *11 (E.D. Pa. Oct. 25, 2015) (rejecting the plaintiff's alter ego theory because the plaintiff had "not set forth any facts to suggest that Indivior was grossly undercapitalized, failed to observe corporate formalities, had its funds siphoned or used indiscriminately by I-PLC, failed to maintain corporate records, or was otherwise a mere façade"); *Norfolk S. Rwy. Co. v. Pitt. & W.V. R.R.*, 153 F. Supp. 3d 778, 809–10 (W.D. Pa. 2015) (declining to hold a parent entity liable under an alter ego theory where the plaintiffs presented only evidence that there was some overlap between the parent's and the subsidiary's boards); *Sheet Metal Workers' Int'l*, 2013 WL 867123, at *6 ("In sum, the evidence shows Main Line and Sands did not share substantially identical supervisors, business purposes, operations, equipment, or customers.  The fact Santos owned and ran both businesses, alone, is simply not enough to [establish alter ego liability].").

Taking the evidence in the record in the light most favorable to Hoelzle, Hoelzle has failed to put forth sufficient evidence to support the imposition of alter ego liability. Accordingly, Defendants' motion for summary judgment on Hoelzle's claims is granted as to Vensure as to Counts I, II, III, and IV (the claims arising out of Hoelzle's alleged employment relationship with EmployeeMax), and Hoelzle's cross-motion for summary judgment on Counts I, II, and III is denied as to Vensure.

### Count I:  Breach of Contract

Hoelzle claims that EmployeeMax breached his offer letter with ESO[12] by failing to pay him for commissions he earned and the time accrued from the beginning of his employment with ESO.[13]  Defendants argue that this claim fails because EmployeeMax never assumed Hoelzle's employment contract with ESO.  (Doc. No. 29-2 at 13.)  In response, Hoelzle argues that EmployeeMax did assume his employment contract and is "bound by the terms of the [o]ffer letter" under a theory of successor liability.  (Doc. No. 34-1 at 16.)

### a.   EmployeeMax Did Not Expressly Assume Hoelzle's Employment Contract Through the Asset Purchase Agreement

To prevail on a breach of contract claim, a plaintiff must prove (1) the existence of a contract, (2) a breach of a duty imposed by the contract, and (3) damages.  *Sullivan v. Chartwell Inv. Partners, L.P.*, 873 A.2d 710, 716 (Pa. Super. Ct. 2005).  Only the first element, whether a contract existed between Hoelzle and EmployeeMax, is in dispute here.  Hoelzle and the Defendants disagree as to whether EmployeeMax assumed his employment contract in the Asset Purchase Agreement,[14] so the Court must determine whether the Asset Purchase Agreement

---

[12] The offer letter constitues Hoelzle's employment contract with ESO.  *See Ozburn-Hessey Logistics, LLC v. 721 Logistics, LLC*, 40 F. Supp. 3d 437, 455 (E.D. Pa. 2014).

[13] Hoelzle has shown that he is entitled to, but did not receive, certain commission payments (Doc. No. 34-9 at 86); however, he has not put forth any record evidence that he accrued but did not use any vacation, sick, or personal days.  In fact, at oral argument, Hoelzle's counsel conceded that there is no record evidence showing how many vacation, sick, and personal days he had accrued but not used.  Even if Hoelzle had put forth evidence that he had accrued but not used sick days, his breach of contract claim would still fail as to that claim because the ESO employee handbook does not provide that employees are paid out for accrued but unused sick days.  (*See id.* at 41 ("You will be paid out for accrued but unused vacation and/or personal days as part of your last paycheck.").)

[14] Defendants also contend that Hoelzle terminated his employment contract with ESO because he resigned from his position at ESO over the disagreement regarding the Asset Purchase Agreement.  (Doc. No. 29-2 at 7.)  This argument is disingenuous.  The undisputed facts in the record show that Hoelzle resigned only from his position on ESO's board of directors, not from his position as ESO's Vice President of Business Development.  (*See* Doc. No. 34-9 at 47 (email from Glover sent the day the

transferred Hoelzle's employment contract.

Although Hoelzle's claims arise under Pennsylvania law, the Asset Purchase Agreement is governed by and must be construed in accordance with Delaware law.  (Doc. No. 29-1 at 94.) Under Delaware law, the role of the court in interpreting contracts "is to effectuate the parties' intent."  *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).  "In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein."  *E.I. du Pont de Nemours and Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del.1985).  If a contract is unambiguous, the court must "interpret the contract based on the plain meaning of the language contained on the face of the document."  *JFE Steel Corp. v. ICI Ams., Inc.*, 797 F. Supp. 2d 452, 469 (D. Del. 2011) (citing *GB Biosciences Corp. v. Ishihara Sangyo Kaisha, Ltd.*, 270 F. Supp. 2d 476, 481–82 (D. Del. 2003)).  But if a contract is ambiguous, the "court may consider evidence of prior agreements and communications of the parties as well as trade usage or course of dealing."  *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del.1997).  A contract is ambiguous "when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."  *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195–96 (Del. 1992).  "Courts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty.  *Id.* at 1196.

The plain language of the Asset Purchase Agreement is clear—EmployeeMax did not assume Hoelzle's employment contract.  Section 2.1 details the assets EmployeeMax purchased

---

transaction was executed stating, "Effective immediately Brian Hoelzle and I resign from the [ESO] board of Directors.  Chris Hogg as a single member is free to sign the board resolution and consummate the transactions with Vensure.").)

(the "Purchased Assets"):  all machinery, equipment, goods, and the like; *all contracts set forth in Schedule 2.1(b)*; all rights to payment; all pre-paid assets; all rights to leases; all trade names; all phone numbers; all intellectual property; all of ESO's operational data, including customer lists and sales records; all goodwill; all government licenses and permits; all cash and cash equivalents; all books and records; and all rights to insurance proceeds relating to the purchased assets.  (Doc. No. 29-1 at 58–60 (emphasis added).)  Section 2.2 clearly provides that EmployeeMax did not assume any contract of ESO's other than those explicitly listed in Schedule 2.1(b).  (*Id.* at 60.)  Schedule 2.1(b) lists two-and-a-half pages of contracts EmployeeMax assumed, but it *does not* list Hoelzle's employment contract, so EmployeeMax did not expressly assume Hoelzle's employment contract through the Asset Purchase Agreement.  (*Id.* at 155–57.)  *See Ciber Glob., LLC v. SAP Am., Inc.*, CIVIL ACTION NO. 19-5884, 2021 WL 1141661, at *2, *6 (E.D. Pa. Mar. 25, 2021) (holding that an asset purchase agreement did not transfer "rights title and interest in the accounts receivable" because the schedule detailing the "Purchased Assets" listed only "accounts receivable" and not the seller's rights, title, and interest therein).

Additionally, Section 7.2(a) provides that, on the date of closing, ESO "shall cause the employment of all Employees . . . listed in Schedule 7.2(a)(i) to be terminated and shall promptly pay each such Employee for all wages, salary, bonuses and commissions" and that EmployeeMax "shall offer employment to Employees terminated in accordance with the preceding sentence . . . on terms and conditions substantially equivalent (in the aggregate) to those in effect on the Agreement Date."  (*Id.*)  But Schedule 7.2(a)(i) does not list *any employees*

to be terminated on the date of closing.[15]  (*See id.* at 191 (listing "NONE" as the employees to be "terminated as of the date of the Closing by Seller").)  This means that ESO did not terminate Hoelzle at the time of closing, and EmployeeMax did not hire Hoelzle at the time of closing.

Although the Asset Purchase Agreement is clear that EmployeeMax did not assume Hoelzle's employment contract, he argues that we should not consider the Asset Purchase Agreement because it "was not approved by the members of [the board] as required by the [ESO] Operating Agreement."  (Doc. No. 34-1.)  But even if the Asset Purchase Agreement was invalid,[16] Hoelzle's argument that EmployeeMax assumed his employment contract with ESO would nevertheless fail because he has not presented any evidence that he ever had a contract with EmployeeMax and has conceded that he never had a contract with EmployeeMax.  (*See* Doc. No. 29-1 at 236, (Hoelzle testifying that Defendants orally promised to "get us a contract" but never told him that "in writing" or sent a contract); *id*. at 244–45 (Hoelzle testifying that Defendants said, "They very much wanted us to stay on . . . and they said sure, just laissez-faire-ly said: 'We're happy to put something together, and this happened so quickly, and we'll put together a contract" and conceding that it (i.e., the contract with EmployeeMax) "never happened.").)  *See Kenny v. Onward Search*, 713 F. App'x 112, 116 (3d Cir. 2017) (affirming district court's grant of summary judgment on breach of contract claim where the plaintiff

---

[15] Defendants' characterization of this provision is misleading.  They state, "Section 7.2 of the [Asset Purchase Agreement] stated that all employees of ESO were to be terminated and paid any outstanding wages by ESO and that EmployeeMax would offer those terminated employees employment with EmployeeMax."  (Doc. No. 29-2 at 8.)  They fail to mention that Schedule 7.2(a)(i) indicates that *no employees* were terminated pursuant to this provision.

[16] Hoelzle concedes that the Asset Purchase Agreement closed and that "ownership of ESO did transfer to Defendants" (Doc. No. 34-2 ¶¶ 49, 51) and has not presented any evidence that the Asset Purchase Agreement was invalid.

"[could] not establish that a valid contract existed"); *Granelli v. Chi. Tit. Ins. Co.*, 569 F. App'x 125, 129 (3d Cir. 2014) (affirming district court's grant of summary judgment on breach of contract claim because the plaintiff "failed to point to any evidence establishing that" it had a "contractual relationship" with the defendant).

Taking the evidence in the light most favorable to Hoelzle, he has failed to establish the existence of an express contract between himself and EmployeeMax.

### b.    EmployeeMax Is Liable Under a Theory of Successor Liability

Although EmployeeMax did not expressly assume Hoelzle's employment contract with ESO through the Asset Purchase Agreement, EmployeeMax may nonetheless be liable under a theory of successor liability.

Under Pennsylvania law, "when one company sells or transfers all of its assets to a successor company, the successor does not acquire the liabilities of the transferor corporation merely because of its succession to the transferor's assets." *Buck v. Endo Pharms., Inc.*, CIVIL ACTION NO. 19-837, 2019 WL 1900475, at *3 (E.D. Pa. Apr. 29, 2012).  However, a court may hold a purchaser liable for the successor company's obligations if one of the following exceptions applies:  "(1) the purchaser of assets expressly or impliedly agrees to assume obligations of the transferor; (2) the transaction amounts to a consolidation or de facto merger; (3) the purchasing corporation is merely a continuation of the transferor corporation; or (4) the transaction is fraudulently entered into to escape liability[.]"  *Phila. Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 308–09 (3rd Cir. 1985).  Hoelzle argues that EmployeeMax is responsible for the obligations of Hoelzle's employment contract with ESO because it impliedly assumed that contract.  (Doc. No. 34-1 at 17.)

In considering whether a purchaser impliedly assumed its predecessor's obligations,

courts consider the following factors:  (1) "whether the successor's conduct indicated its intention to assume the [obligation]"; (2) "whether the creditor relied on the conduct and the effect of any reliance"; and (3) "whether the successor's representatives admitted liability." *Bird Hill Farms, Inc. v. U.S. Cargo & Courier Service, Inc.*, 845 A.2d 900, 906 (Pa. Super. Ct. 2004). This is a balancing test; the presence or absence of any one factor is not dispositive. *Id.*  In *Bird Hill Farms*, the Pennsylvania Superior Court affirmed the trial court's holding that the purchaser had impliedly assumed a lease even though that lease was not expressly included in the asset purchase agreement because the purchaser occupied the leased space for eleven months, paid rent for the space in its own name, paid utilities in its own name, and installed fire extinguishers in the space as required by the lease.  *Id.* at 904; *see also Tender Touch Rehab Servs., LLC v. Brighten at Bryn Mawr*, 26 F. Supp. 3d 376, 395–400 (E.D. Pa. 2014) (concluding that a reasonable jury could find that the purchaser implicitly agreed to assume the predecessor's debt where it paid past due invoices on the debt).

Here, the first and second factors set forth in *Bird Hill* are present.  EmployeeMax's treatment of Hoelzle evidences an intent to assume his employment contract with ESO:  Hoelzle was not terminated from ESO at the time of the asset purchase but instead began working for EmployeeMax when the transaction closed (Doc. No. 29-1 ¶ 16); he had the same day-to-day responsibilities as he had at ESO (*id.* ¶ 17); and he was paid the same salary as he had been paid at ESO (*id.* ¶ 17; Doc. No. 29-1 at 205 (Vensure CEO testifying that he "can assure that [Hoelzle] cashed a paycheck for many, many weeks [after the transaction]" and was "sure . . . he was getting paid")).  The facts and circumstances also evidence Hoelzle's reliance on EmployeeMax's conduct:  he cashed his paycheck (for the same salary he had been receiving at ESO) (Doc. No. 34-2 ¶ 50); he brought in new clients (*id.* ¶ 52); and he did not seek alternate

employment (*id.* ¶ 50).  *See Tender Touch Rehab Servs.*, 26 F. Supp. 3d at 400 (finding that the plaintiff had relied on the defendant's conduct where the defendant continued to pay the plaintiff and the plaintiff continued to provide its services).  Finally, the third factor, whether the successor's representatives admit liability, weighs against a finding of implicit assumption because EmployeeMax and Vensure's employees assert that they did not assume Hoelzle's employment contract.

Even though the third factor weighs against a finding of successor liability, the first two factors, and in particular EmployeeMax's use and treatment of Hoelzle, weigh heavily in favor of a finding that EmployeeMax did assume Hoelzle's employment contract.  The presence of the first two factors is sufficient for the Court to find that EmployeeMax impliedly assumed Hoelzle's employment contract with ESO and is thereby liable for the obligations set forth in that contract under a theory of successor liability.  *See Bird Hill Farms*, 845 A.2d at 906 (concluding that the successor impliedly assumed a lease even though the successor disputed that it had assumed the lease because the successor's conduct "indicated an intent to assume the lease" and the plaintiff relied on the successor's actions").

Viewing the evidence in the light most favorable to EmployeeMax, EmployeeMax impliedly assumed Hoelzle's employment contract and thus is liable for obligations arising thereunder on a theory of successor liability.

*            *            *

Although there is no evidence in the record that any contact existed between Hoelzle and EmployeeMax, EmployeeMax is liable for Hoelzle's employment contract with ESO under a theory of successor liability.  Accordingly, Hoelzle's motion for summary judgment is granted as to the commission payments sought under Count I as against EmployeeMax, and Defendants'

motion for summary judgment is granted as to the accrued but unused sick, vacation, and personal time and business expenses.

### Count II:  Unjust Enrichment

Hoelzle brings a claim for unjust enrichment in the alternative to the breach of contract claim (Count I).  (Doc. No. 1 at 39–40.)  Because we determined that EmployeeMax is liable for Hoelzle's employment contract under a theory of successor liability, we need not consider the unjust enrichment claim, and Hoelzle's and Defendants' motions for summary judgment on Count II are denied as moot.

### Count III:  WPCL

Hoelzle claims that Defendants violated the WPCL by failing to pay him commissions he earned while at ESO.[17]  (Doc. No. 1 at 40–42.)  To prove a WPCL claim, a plaintiff must show (1) that he was contractually entitled to certain wages; and (2) that he was not paid those wages. *Id.*  Wages include "all earnings of an employee, regardless of whether determined on time, task, piece, *commission*, or other method of calculation."  43 Pa. Stat. Ann. § 260.2a (emphasis added).

Hoelzle has satisfied his burden under the WPCL.  First, he has shown that he was contractually entitled to receive commissions, was due to receive $38,998.26 in commissions, and did not receive those commissions.  (*See* Doc. No. 34-7 at 213; Doc. No. 34-9 at 51–86.)

Defendants dispute Hoelzle's contractual entitlement to receive commission payments because he "either resigned from ESO and terminated the offer letter, was terminated from ESO

---

[17] Hoelzle also claims that he was due but not paid accrued but unused vacation, personal, and sick time and reimbursable business expenses; however, as discussed above, *see supra* n.13, he has not identified any record evidence showing that he was contractually entitled to any of those payments.

and hired with EmployeeMax as part of the [Asset Purchase Agreement], or did not have his Offer Letter sold by ESO to EmployeeMax under the [Asset Purchase Agreement]." (Doc. No. 29-2 at 17.) But Defendants' arguments all fail: Hoelzle never resigned from his position as Vice President of Business Development at ESO—he resigned only from his position as a director of ESO. (*See* Doc. No. 34-9 at 47 (email from Glover stating, "Effective immediately Brian Hoelzle and I resign from the [ESO] *board of Directors*.") (emphasis added).) Nor did ESO terminate Hoelzle in connection with the Asset Purchase Agreement. (*See* Doc. No. 29-1 at 79, 191 (indicating that no employees were terminated from ESO as a condition of the Asset Purchase Agreement).) And finally, as discussed above, EmployeeMax is liable for Hoelzle's employment contract with ESO under a theory of successor liability because it impliedly assumed the contract. *See supra* Section II.B, Count I. Notably, although Defendants dispute the fact that EmployeeMax was bound by the employment contract, they have not put forth any arguments or evidence disputing the amount of commission payments to which Hoelzle claims he is entitled. (Doc. No. 35 ¶ 58.)

As to the second requirement, EmployeeMax concedes that it did not pay Hoelzle the commission payments he was due pursuant to his offer letter with ESO. (Doc. No. 29-1 ¶ 29 ("At the time of Hoelzle's termination from EmployeeMax, EmployeeMax paid all of Plaintiff's unpaid compensation, paid time off, and other benefits that had accrued during his employment, which compensation *was not inclusive* of any amounts alleged to be due through his prior employment with ESO and his offer letter with ESO.").) Thus, Hoelzle has established that he was entitled to but did not receive commission payments.

In addition to the unpaid commissions, Hoelzle seeks liquidated damages and attorneys' fees under the WPCL. The WPCL allows for the recovery of liquidated damages in the amount

20

of 25% of the total wages due where there was no "good faith contest or dispute" that the employee was entitled to the unpaid wages.  *See* 43 Pa. Stat. Ann. § 260.10.  Here, however, there was a "good faith dispute" as to whether EmployeeMax was required to pay the commission payments he earned while at ESO.  EmployeeMax believed, in good faith, that it had not assumed the only contract that entitled Hoelzle to commission payments—i.e., his employment contract with ESO.  Although we ultimately found that EmployeeMax had assumed the contract, it was a close call, and EmployeeMax put forth multiple non-frivolous arguments in support of its position.  This is a "good faith dispute," so Hoelzle is not entitled to liquidated damages under the WPCL.  *See Hartman v. Baker*, 766 A.2d 347, 354–55 (Pa. Super. Ct. 2000) (declining to award liquidated damages where the employer "made an incorrect legal conclusion in good faith that was based upon supportive authority" that it was not required to pay certain wages, even though the court later found that it was entitled to pay those wages); *see also Cook Techs., Inc. v. Panzarella*, CIVIL ACTION NO. 15-CV-1028, 2018 WL 6616932, at *28 (E.D. Pa. Dec. 18, 2018) ("While hindsight now shows the ill-advised nature of this [legal and accounting] advice, it nevertheless suffices to provide [the defendants] an adequate 'good faith' basis to relieve them of the WPCL's imposition of the 25% liquidated damages as a sanction for their decision.").

The WPCL also allows for the recovery of attorneys' fees.  *See* 43 Pa. Stat. Ann. § 260.9a.  Hoelzle has alleged that he has incurred $45,000 in attorneys' fees in prosecuting this claim (Doc. No. 34-2 ¶ 58); however, he has not presented any evidence (billing records, invoices, etc.) that he is entitled to recover such fees.  Accordingly, the Court will deny Hoelzle's request for attorneys' fees without prejudice to Hoelzle's right to file a motion for attorneys' fees (supported by the proper documentation) within 30 days of the entry of this Memorandum.

In sum, the Court grants Hoelzle's motion for summary judgment and denies Defendants'

motion for summary judgment on the WPCL claim arising out of the unpaid commissions as to

EmployeeMax; however, Hoelzle is not entitled to liquidated damages and is required to file a

post-summary judgment motion should he seek to recover attorneys' fees.  The Court grants

Defendants' motion for summary judgment on the WPCL claim arising out of the accrued but

unused sick, vacation, and personal time and business expenses.

### Count IV:  Wrongful Termination

Hoelzle claims that he was wrongfully terminated from his position at EmployeeMax for

reporting Hogg's criminal activity to the FBI.  (Doc. No. 1 at 42–43.)  Defendants argue that this

claim should be dismissed because Hoelzle is an at-will employee and his termination did not

violate public policy.  (Doc. No. 29-2 at 15–16.)

The parties agree that Hoelzle was an at-will employee.  (*See* Doc. No. 29-1 ¶ 16; Doc.

No. 34-2 ¶ 16.)  In Pennsylvania, an employer may terminate an at-will employee "for good

reason, bad reason, or no reason at all."  *Hershberger v. Jersey Shore Steel Co.*, 575 A.2d 944,

946 (Pa. Super. Ct. 1990) (citing *Henry v. Pitt. & Lake Erie R.R. Co.*, 139 Pa. 289, 21 A. 157,

157 (Pa. 1891)).  At-will employees can bring wrongful termination claims "only in the most

limited of circumstances where the termination implicates a clear mandate of public policy in

th[e] Commonwealth."  *McLaughlin v. Gastrointestinal Specialists, Inc.*, 750 A.2d 283, 287

(2000).  A termination violates public policy where it infringes on constitutional or statutory

rights.  *Bennett v. Rep. Servs., Inc.*, 179 F. Supp. 3d 451, 456–57 (E.D. Pa. 2016) (collecting

cases).  Courts will not extend the public policy exception where an employee was terminated for

reporting wrongdoing if he had no legal duty to report such wrongdoing.  *See Fraser v.*

*Nationwide Mut. Ins. Co.*, 352 F.3d 107, 112–13 (3d Cir. 2003).  To establish a claim for

wrongful termination, an at-will employee must show that the protected activity he engaged in "was a substantial factor in [his employer's] decision to fire him."  *Rothrock v. Rothrock Motor Sales, Inc.*, 883 A.2d 511, 517 (Pa. 2005); *see also Walker v. Monacacy Valley Elec., Inc.*, Civil No. 1:17-CV-2142, 2020 WL 207160, at *5 (M.D. Pa. Jan. 14, 2020) ("The elements of the public policy [retaliatory termination] claim are essentially adaptations of the elements in tort claims generally, requiring both causation of harm and fault on the part of the employer that would tend to undermine public policy." (internal citations omitted)).

Hoelzle argues that his termination violates public policy because he was terminated for reporting Hogg's criminal activities to the FBI.  (Doc. No. 34-1 at 25–27.)  Hoelzle's claim fails for two reasons:  he was not legally required to report his former colleague's alleged criminal activities, and even if he had been, he has not shown a causal connection between his reporting and his termination.  First, the public policy exception does not apply because Hoelzle had no legal obligation to report his former colleague's wrongdoings.  *See Fraser*, 352 F.23d at 113 (affirming the district court's grant of summary judgment were the plaintiff "ha[d] [not] pointed us to any statutory duty to report [the defendant's] violations of the law"); *Hennessy v. Santiago*, 708 A.2d 1269, 1273–74 (Pa. Super. Ct. 1998) (dismissing the plaintiff's wrongful termination claim because the plaintiff had no statutory duty to report her colleague's rape).

Second, Hoelzle has not presented any evidence that EmployeeMax was aware that he planned to report or had reported Hogg's activities to the authorities.  He has merely put forward a conclusory assertion that Hogg told his associate Vik Jain (who had connections at Vensure) that Hoelzle planned to report Hogg's activity, but nowhere does Hoelzle assert let alone put forth evidence that Jain told anyone at EmployeeMax or Vensure about Hoelzle's plan to report Hogg.  (*See* Doc. No. 34-2 ¶ 55 ("There can be little doubt that Hogg informed Vik Jain of his

receipt of [Hoelzle's] text message and five (5) days later on February 20, 2019, [Hoelzle] was

fired by Defendants.").)  Indeed, the evidence in the record shows that Defendants were not

aware that he reported Hogg's criminal activity to the FBI.  (*See* Doc. No. 29-1 at 222

(Vensure's Chief Revenue Officer testifying that he was not "aware that [Hoellzle] had any

communications with the FBI" prior to his termination).  "[A] summary judgment motion cannot

be defeated by speculation and conjecture."  *Parker v. Sch. Dist. of Phila.*, 823 F. App'x 68, 72

(3d Cir. 2020).  Because Hoelzle has not presented evidence supporting a causal link between his

termination and the fact that he reported Hogg's criminal activities to the FBI, his wrongful

termination claims fails.  *See Goodman v. Unity Twp., Pa.*, No. 2:03-CV-1650, 2006 WL

840339, at *7 (W.D. Pa. Mar. 30, 2006) (granting the defendant's motion for summary judgment

on wrongful termination claim where the plaintiff had not presented any evidence showing "a

causal relationship between his workers' compensation claim and the [defendant's] refusal to

allow him to return to his job" where the only evidence the plaintiff presented did not suggest

that the defendant "had any animus towards [the plaintiff] or any other employee who made

workers' compensation claims").

Because Hoelzle has failed to establish that he was wrongfully terminated, the Court

grants Defendants' motion for summary judgment on Count IV.

### Count V:  Breach of Contract

Next, Hoelzle brings a claim for breach of contract arising out of Defendants' failure to

indemnify him in the *Curran* Lawsuit.  (Doc. No. 1 at 44–45.)

### a.      Breach of Contract

Hoelzle argues that Defendants "agreed to provide for the defense and indemnification of

[Hoelzle] in all lawsuits related to his employment as employee of EmployeeMax . . . ."[18]  (*Id.* at 44.)  Defendants argue that this breach of contract claim fails because Hoelzle has not presented any evidence that a contract existed requiring Defendants to indemnify him in the *Curran* Lawsuit.[19]  (Doc. No. 29-2 at 14.)

An enforceable contract exists where there is an offer, acceptance, and consideration. *ATACS Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 665–66 (3d Cir. 1998). Performance of a preexisting duty is not consideration.  *Fennimore v. Bank of Am., N.A.*, CIVIL ACTION NO. 14-06883, 2015 WL 7075814, at *8 (E.D. Pa. Nov. 12, 2015).  The parties disagree as to whether Defendants offered to indemnify Hoelzle.  (Doc. No. 34-2 ¶ 51; Doc. No. 35 ¶ 51.)  But even assuming *arguendo* that Defendants offered to cover at least a portion of the legal fees had had incurred in connection with the *Curran* Lawsuit, there is no record evidence that Hoelzle offered any consideration whatsoever in exchange for this promise.  Hoelzle does not claim to have offered any consideration, and his "continu[ed] employment [with EmployeeMax] is not sufficient additional consideration."  *Cathcart v. Micale*, 402 F. Supp. 3d 110, 113 (E.D. Pa. 2019).  Because Hoelzle did not provide any consideration in exchange for Defendants' purported agreement to indemnify him, he has failed to establish the existence of a contract, and this breach of contract claim fails.  *See Crump v. MetaSource Acquisitions, LLC*, 373 F. Supp. 3d 540, 548–49 (E.D. Pa. 2019) (finding an employment arbitration agreement invalid where the employer offered no consideration for the agreement other than continued

---

[18] Hoelzle does not contend (nor could he) that the ESO offer letter included an indemnity provision.  This claim is based entirely on Campos's alleged oral promises.

[19] As noted above, to prevail on a breach of contract claim, a plaintiff must prove (1) the existence of a contract, (2) a breach of a duty imposed by the contract, and (3) damages.  *Sullivan*, 873 A.2d at 716.

employment because "continued employment does not demonstrate that the necessary exchange of consideration has taken place"); *Socko v. Mid-Atlantic Sys. of CPA, Inc.*, 126 A.3d 1266, 1275 (Pa. 2015) ("When a non-competition clause is required after an employee has commenced his or her employment, it is enforceable only if the employee receives "new" and valuable consideration—that is, some corresponding benefit or a favorable change in employment status.").

### b.    Successor Liability

Hoelzle argues, in the alternative, that EmployeeMax is bound by the EMIH Operating Agreement (which includes an indemnification provision) because EmployeeMax impliedly assumed the EMIH Operating Agreement and its indemnification obligation through the Asset Purchase Agreement.  (Doc. No. 34-1 at 23.)  The EMIH Operating Agreement provides that it "shall indemnify and hold each *Director* harmless from and against all liability, claim, loss, damage or expense, including reasonable attorneys' fees, incurred by the *Director* by reason of any act or omission of the *Director* made in good faith on behalf of the Company."[20]  (Doc. No. 34-7 at 198 (emphases added).)

Even if EmployeeMax had assumed EMIH's indemnification obligation, EMIH promised only to indemnify *directors* (*see id.*), and it is undisputed that Hoelzle resigned from the EMIH Board of Directors before the Asset Purchase Agreement was executed (*see* Doc. No. 34-9 at 47).  Because Hoelzle is no longer an EMIH director, he is no longer entitled to indemnification payments (from EMIH, Defendants, or otherwise) under the EMIH Operating Agreement.

\*     \*     \*

---

[20] Prior to the Asset Purchase Agreement, Hoelzle sat on the EMIH board of directors.

Hoelzle has failed to establish the existence of a contract requiring Defendants to indemnify him in connection with the *Curran* Lawsuit, so this breach of contract claim fails. As such, Defendant's motion for summary judgment is granted as to Count V, and Hoelzle's cross-motion for summary judgment is denied as to Count V.

### Count VI:  Promissory Estoppel

Hoelzle also brings a claim for promissory estoppel because Defendants purportedly promised to indemnify him "in all lawsuits related to his employment as employee of EmployeeMax." (Doc. No. 1 at 45.)  Defendants argue that the promissory estoppel claim fails because Hoelzle "has not demonstrated that he took any action or refrained from taking action as a result" of the claimed promise to indemnify.  (Doc. No. 29-2 at 19.)  Hoelzle responds that he has established a claim for promissory estoppel because Defendants promised to indemnify him and, in reliance on that promise, he "continued to work for Defendants and forego other employment opportunities" and continued to "vigorously defend himself in the Curran litigation."  (Doc. No. 34-1 at 25.)

To establish a claim for promissory estoppel, a plaintiff must show that "(1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; (2) the promisee actually took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise." *Crouse v. Cyclops Indus.*, 745 A.2d 606, 610 (Pa. 2000).  A claim for promissory estoppel cannot be "based on the alleged existence of . . . a broad and vague implied promise."  *C&K Petroleum Prods., Inc. v. Equibank*, 839 F.2d 188, 192 (3d Cir. 1988).

Here, Hoelzle argues that Vensure's CEO "consistently assured him that Defendants would make things right with respect to EMIH's indemnity obligations regarding the Curran

Litigation." (Doc. No. 34-2 ¶ 51.)  He also testified as to Defendants' purported promise to indemnify him:

> A:  . . . I requested that they indemnify me and pay for my legal fees, and that never happened.
>
> Q:  Did Vensure agree to that?
>
> A:  They said we were partners and that *we would work together* . . .
>
> Q:  In other words, is there more specific conversations in which you were promised or Vensure and EmployeeMax otherwise agreed to indemnify you? . . .
>
> A:  [T]hey were very bullish and excited about the partnership and *said that they would help out in any means that we needed as partners*. . . . They claim that we're partners and that they now held the assets so it didn't make sense for myself to take on liability for something that I no longer . . . Unfortunately, these individual[s] never provided me with anything in writing.

(Doc. No. 29-1 at 249–52 (emphases added).)

Hoelzle's testimony lacks specificity:  there is no evidence of when Defendants promised to indemnify Hoelzle, the period for which Defendants promised to indemnify Hoelzle, or to what extent Defendants promised to indemnify Hoelzle.  Defendants' promises to "make things right," "work together," and "help out in any means" are far too vague to be the bases for a promissory estoppel claim.  *See Ankerstjerne v. Schlumberger Ltd.*, 155 F. App'x 48, 51 (3d Cir. 2005) (holding that statements that the defendant "would get it taken care of" were "simply too vague and indefinite to constitute a 'promise' for purposes of promissory estoppel"); *ProgenyHealth, Inc. v. CareSource Mgmt. Grp., Co.*, CIVIL ACTION NO. 17-cv-873, 2017 WL 2618879, at *3–4 (E.D. Pa. June 16, 2017) (holding that the defendant's statement that they "were working as 'partners'" with the plaintiff was "not the sort of express promise that can

28

support a promissory estoppel claim"); *Burton Imaging Grp. v. Toys "R" Us, Inc.*, 502 F. Supp. 2d 434, 439 (E.D. Pa. 2007) ("This statement of 'going to move ahead' is simply insufficient to qualify as a promise for a claim of detrimental reliance because it . . . fails to indicate key terms such as payment to Burton or duration of the Scrim contract."); *KSM Assocs., Inc. v. ACS State Healthcare, LLC*, Civil Action No. 05-4118, 2006 WL 1308267, at *2 (E.D. Pa. May 10, 2006) (holding that the defendant's promise was too vague to support a claim for promissory estoppel where the specifics of the purported promise, including the scope of services and compensation, remained unresolved).

Accordingly, the Court grants Defendants' motion for summary judgment on Count VI.

**Counterclaim Count I:  Tortious Interference with Contractual Relations**

Defendants bring a counterclaim for tortious interference with contractual relations, alleging that Hoelzle made false statements regarding Defendants' new software system "with the intention to interfere with EmployeeMax's contractual relations" with certain of its clients. (Doc. No. 3 at 18.)  Hoelzle argues that these claims fail because his statements were true and Defendants have not identified any customers who terminated their contract with Defendants as a result of his statements.  (Doc. No. 34-1 at 31.)

To state a claim for tortious interference with existing contractual relationships, a party must establish:

> (1) the existence of a contractual . . . economic relationship between the plaintiff and a third party; (2) purposeful action by the defendant, specifically intended to harm an existing relationship . . . ; (3) the absence of privilege or justification on the part of the defendant; [and] (4) legal damage to the plaintiff as a result of the defendant's conduct.

*Acumed LLC v. Adv. Surgical Servs., Inc.*, 561 F.3d 199, 212 (3d Cir. 2009).  The parties agree

that the first two elements are satisfied but dispute whether Hoelzle's statements were privileged or justified and whether Defendants suffered damages because of his conduct.

This claim fails because there is no real dispute that Defendants have not suffered any damages *as a result of* Hoelzle's statements.  The evidence in the record shows that Defendants were not aware of any customers who left EmployeeMax because of Hoelzle's statements. Vensure's CEO testified that he "[didn't] remember the specifics" of clients who "left or no longer were interested in using EmployeeMax as a result of Mr. Hoelzle" (Doc. No. 34-7 at 174), and Vensure's Chief Revenue Officer testified that that he did not recall whether "any customers [had] inform[ed] EmployeeMax or Vensure that they were discontinuing services with EmployeeMax because of communications with Mr. Hoelzle" (Doc. No. 34-9 at 101).

Defendants do, however, point to an affidavit from Vensure's CEO stating that NET100, one of EmployeeMax's clients Hoelzle contacted in May 2018, "was no longer a client as of July 31, 2019."  (Doc. No. 35 at 20.)  But this self-serving affidavit does not save the claim from summary judgment because it does not establish that NET100 left EmployeeMax *because of* Hoelzle's statements.  In fact, Defendants concede that "the extent of attrition of EmployeeMax's clients that could have been caused by false statements about the Defendants made by [Hoelzle] is *impossible to ascertain*."  (*Id.*)  Because Defendants cannot identify any damages they have suffered *due to* Hoelzle's statements, their claim for tortious interference with existing contractual relations fails.  *Hyldahl v. Denlinger*, 661 F. App'x 167, 171 (3d Cir. 2016) ("Because the fourth element of a tortious interference claim requires a causal link between the tortious conduct and the asserted damage, Hyldahl must be able to show that the allegedly tortious conduct caused his termination."); *Rose v. Dowd*, 265 F. Supp. 3d 525, 534 (E.D. Pa. 2017) ("Rose fails to allege sufficient facts to demonstrate a causal connection between his

damages, purportedly the compensation to which he would have been entitled had Skechers renewed its endorsement contract with Rose, and Dowd's conduct.").

Thus, the Court grants Hoelzle's motion for summary judgment on Counterclaim Count I.

### Counterclaim Count II:  Tortious Interference with Prospective Contractual Relations

Defendants also bring a claim for tortious interference with prospective contractual relations.  (Doc. No. 3 at 19–21.)  The elements for tortious interference with prospective contractual relations are the same as for tortious interference with existing contractual relations, except the party bringing the claim must also show "a reasonable likelihood that the relationship would have occurred but for the . . . interference."  *Acumed*, 561 F.3d at 212.

But Defendants concede that they "are unable to point to or otherwise ascertain any customers who may have chosen not to engage with Defendants as a result of statements made by Plaintiff."  (Doc. No. 35 ¶ 65.)  At oral argument, Defendants' counsel reaffirmed this concession; he admitted that Defendants cannot identify any prospective contracts Defendants did not receive due to Hoelzle's statements.  *See Almac Clinical Servs., LLC v. Aeri Park*, CIVIL ACTION NO. 16-4896, 2016 WL 5912708, at *9 (E.D. Pa. Oct. 11, 2016) ("I determined above that no breach of her contract has occurred or is likely to occur, meaning that plaintiffs have incurred no damages for this claim."); *Youtie v. Macy's Retail Holding, Inc.*, 626 F. Supp. 2d 511, 528 (E.D. Pa. 2009) (granting summary judgment on tortious interference claim because the contract with which counterclaim defendants had allegedly interfered had not been terminated).

Because Defendants have not suffered any damages, their claim for tortious interference with prospective contractual relations fails, and the Court grants Hoelzle's motion for summary judgment on Counterclaim Count II.

31

**Counterclaim Count III:  Commercial Disparagement**

Defendants also bring a claim for commercial disparagement arising out of Hoelzle's post-termination communications with EmployeeMax clients.  (Doc. No. 3 at 21–22.) Specifically, Defendants claim that Hoelzle told EmployeeMax clients Neff Pharmacy and Net100 that its new software "was unable to migrate their [client] data, provide them with the customer reports they had been receiving, [or] . . . correctly pay local taxes."  (Doc. No. 35 ¶ 61.) Hoelzle argues that this claim fails because his "allegedly disparaging statements are true" and "Defendants have not alleged or provided any specific evidence regarding pecuniary damage." (Doc. No. 34-1 at 29.)

In Pennsylvania, to prevail on a claim for commercial disparagement, a plaintiff must demonstrate the following:

> (1) the statement is false; (2) the publisher either intends the
> publication to cause pecuniary loss or reasonably should recognize
> that publication will result in pecuniary loss; (3) pecuniary loss does
> in fact result; and (4) the publisher either knows that the statement
> is false or acts in reckless disregard of its truth or falsity.

*Neurotron Inc. v. Med. Serv. Ass'n of Pa., Inc.*, 254 F.3d 444, 448–49 (3d Cir. 2001) (quoting Restatement (Second) of Torts § 623(A) (Am. Law Inst. 1977)).

Defendants concede that Hoelzle's statements that EmployeeMax would be "unable to migrate their [clients'] data" and unable to "provide them with . . . customer reports" were true. (Doc. No. 35 ¶¶ 62–64.)  Because these statements were true, Defendants' commercial disparagement claim fails as to these statements.

The parties dispute the veracity of Hoelzle's claim that EmployeeMax would be "unable to pay and process local taxes."  (*Id.* at 64.)  Even assuming Hoelzle's statement regarding EmployeeMax's ability to process taxes was false, the commercial disparagement claim

32

nevertheless fails because Defendants have not identified any pecuniary damage they suffered as a result of Hoelzle's statements.  *See supra* Section II.B, Counterclaim Counts I–II.  *See McNulty v. Citadel Broad. Co.*, 58 F. App'x 556, 566–67 (3d Cir. 2003) (holding that the plaintiff's assertion that he suffered reputational damages was insufficient to support a claim for commercial disparagement because he failed to establish "a link between the [allegedly disparaging] statements and his inability to get a broadcasting job"); *AC2T, Inc. v. Purrington*, CIVIL ACTION NO. 19-5946, 2020 WL 6203573, at *5 (E.D. Pa. Oct. 22, 2020) (dismissing claim for commercial disparagement where the plaintiff failed to allege any specific pecuniary loss).

Accordingly, the Court grants Plaintiff's motion for summary judgment on Counterclaim Count III.

### Counterclaim Count IV:  Defamation

Finally, Defendants bring a claim for defamation arising out of Hoelzle's statements to EmployeeMax's clients.  (Doc. No. 3 at 22–23.)  Hoelzle argues that this claim must fail because his "allegedly defamatory communications . . . were true, or at the very least substantially true." (Doc. No. 34-1 at 28.)

To prevail on a defamation claim in Pennsylvania, a party must show:

    (1)     The defamatory character of the communication.

    (2)     Its publication by the defendant.

    (3)     Its application to the plaintiff.

    (4)     The understanding by the recipient of its defamatory meaning.

    (5)     The understanding by the recipient of it as intended to be applied to the plaintiff.

(6)     Special harm resulting to the plaintiff from its publication.

(7)     Abuse of a conditionally privileged occasion.

42 Pa. Pa. Stat. Ann. § 8343(a).  Critically, Pennsylvania law requires a showing of "special damages"—i.e., "actual and concrete damages capable of being estimated in money, established by specific instances such as actual loss due to withdrawal of trade of particular customers." *Synthes (USA) v. Globus Med., Inc.*, Civil Action No. 04-1235, 2007 WL 2043184, at *2 (E.D. Pa. July 12, 2007) (citing *Beverley Ents., Inc. v. Trump*, 182 F.3d 183, 188 (3d Cir. 1999)).  A defendant may avoid liability if the allegedly defamatory statements were "substantially true." *Graboff v. Colleran Firm*, 744 F.3d 128, 136 (3d Cir. 2014).

As discussed above, both parties agree that the majority of Hoelzle's statements are true. (Doc. No. 35 ¶¶ 62–64.)  And even if his statements about taxes were not true, Defendants have not put forth any evidence that they suffered any "actual and concrete" damages as a result of Hoelzle's statements, and Defendants' unsupported claim that they suffered reputational harm is insufficient to establish such damages.  *See supra* Section II.B, Counterclaim Counts I–III; *see also McNulty*, 58 F. App'x at 566–67 (holding that the plaintiff's assertion that he suffered reputational damages was insufficient to support a claim for defamation because he failed to show "that his reputation was actually damaged in anyone's eyes"); *Psota v. New Hanover Twp.*, CIVIL ACTION NO. 20-5004, 2021 WL 6136930, at *32 (E.D. Pa. Dec. 29, 2021) (holding that the plaintiff failed to establish "actual and concrete damages" where he simply claimed "in a general and conclusory manner" that the alleged defamation caused his "inability to continue to perform his profession as a law enforcement officer").

Because Defendants have not shown that they suffered any damages as a result of Hoelzle's allegedly defamatory statements, their claim fails, and the Court grants Hoelzle's motion for summary judgment on Counterclaim Count IV.

## III.   CONCLUSION

For the reasons above, Defendants' Motion for Summary Judgment (Doc. No. 29) is granted in part and denied in part, and Hoelzle's Cross-Motion for Summary Judgment (Doc. No. 34) is granted in part and denied in part.  As to Count I, Defendants' motion is granted as against Vensure and denied as against EmployeeMax, and Hoelzle's cross-motion is denied as against Vensure and granted as against EmployeeMax.  As to Count II, Defendants' motion and Hoelzle's cross-motion are denied as moot.  As to Count III, Defendants' motion is granted as against Vensure and denied as against EmployeeMax, and Hoelzle's cross-motion is denied as against Vensure and granted as against EmployeeMax; however, Hoelzle's cross-motion is denied as to liquidated damages and denied without prejudice to file a motion for attorneys' fees as to attorneys' fees.  As to Count IV, Defendants' motion is granted.  As to Count V, Defendants' motion is granted and Hoelzle's cross-motion is denied.  As to Count VI, Defendants' motion is granted.  As to Counterclaim Counts I, II, III, and IV, Hoelzle's motion is granted.

An appropriate Order follows.